I please the Court, Steve Breschetta for the Plaintiff, Liani Reyna. Good morning. Breschetta. Your Honors, I would like to reserve five minutes for rebuttal in this argument. You may do so. Just keep your eye on the clock. I will do so. Thank you. In this case, the plaintiff was the first female police officer of the City of Portland appointed to the SIRT team, essentially the SWAT team for the City of Portland. And she alleges that she was subjected to sexual hazing practices, retaliation and forced off the team. We have argued that the district court committed a series of errors which deprived the plaintiff of a fair trial. We are serious about each of those arguments. I'm going to attempt to focus my presentation this morning on three areas where I think that clarification might be of assistance to the Court. There's one area that, and I hope this is one of them because if it's not, I'm going to take you to it. I want you to focus on your instructional error on retaliation. Yes. The instruction error on retaliation, it's a particular question. Well, here's where I'm coming from on that. First off in terms of that, you know, I realize in looking at it that the judge said that I'm going to assume that if I don't, you know, I think instructional, if I don't give something that you ask for or, you know, if I change it or whatever, that you preserve your objection. Obviously, you know, the appellee's lawyer is saying that, you know, you didn't put the placemark in, you didn't adequately object. And then I notice where the judge goes into and you have included in a separate definition of adverse employment on retaliation. Correct. I'm not quite sure. Did you reconstruct that yourself or was that actually in the record? Reconstruct the definition I submitted? Well, yeah, in terms of because I have, I've got the instructions that went to the jury. But then, obviously, the separate definition of retaliation wasn't given by the judge in the instructions. And I didn't see anything in the record that said that was rejected per se. So did the judge just give you that, you had your set, he had his set, and then the judge gave what the judge gave and then you went home with whatever wasn't given or how, was that in the record somewhere written rejected or what was? My definition of adverse employment action was not reconstructed after trial. My definition of adverse instruction action, adverse employment action was submitted to the court pretrial in written requests for jury instructions. And so the court kept that? The court kept that as well as defense submitted separate. Okay. So that should be in the trial court record then. The definition is in the trial court record. Okay. At the jury instructions conference, my recollection is fogging on the precise procedure, but the court ultimately prepared its own written instructions, gave them to counsel. We looked them over and then sat down for a conference. All right. And so then when the court started talking about what instructions the court was going to give, you didn't again say, Your Honor, you're not giving my, you know, was it instruction 28 or I'm not sure I'm getting the right number, that you're not giving my instruction on retaliation, adverse employment as it relates to retaliation because that's different than the adverse employment as it relates to hostile work environment and the other causes of action. I did not at that time say, You are not giving my instruction. I think that context, however, is important. This was done at the end of the day. Well, I was a trial judge, so I know that. But then in terms of now tell me specifically, you know, because obviously on an ideal record you would have said right there and said, Your Honor, adverse employment as it relates to retaliation is different. And I am going to be arguing the retaliation is such and such and therefore, and so the Ninth Circuit law, which you now cite, and then I think you cite Burlington later, but that wasn't in existence at the time that you tried this case, that your instructions aren't adequate because I am arguing these acts of retaliation and for those acts of retaliation, they wouldn't actually qualify as an adverse employment action as you're instructing the jury, so you need to give mine in order to protect the argument that I'm making. That would be really nice and clean. All right. And then I looked at your argument, so tell me if we allow you to put the place setter in to say that you objected regarding how you argued retaliation, what are the acts that you argued, and why then is that error prejudicial? Sure. First, I think it's important to note that this is not a circumstance where the sex discrimination instruction would have applied at all, since that instruction specifically said this is just for sex discrimination. So it just isn't applicable and the jury would have known that. That's what they were told. What are the arguments that we made? We made arguments. Well, what did you claim were the retaliation actions? So we have to, we've got to limit it to that. The retaliation actions were things like taking. Not things like specifically. What are the retaliation actions? The retaliation actions were removing plaintiff, taking plaintiff off of call out for cert. Retaliation actions like forced transfer of plaintiff. The argument was that they compelled plaintiff's transfer. The retaliation argument was that plaintiff was put on the true assignment desk, the telephone report unit. The argument was that she was stood down for call outs. The argument was that she no longer was allowed to write search warrants. The argument was that. Now, most of this, as I understand it, is in the context of her health event that occurred, the possible seizure or whatever. No. Some of it is in the context of the health event. They took her off search warrants before the health event. They stood her down right after the health event. The telephone report unit was after the health event. Our argument of retaliation continued on after that. We alleged that or claimed that they introduced evidence into the investigation of her complaint, attempting to turn the investigation into one of her personal life and her mental stability. We argued that they leaked information about who made the complaint through the Bureau and that that was an act of retaliation. We argued that the team, when going out to her domestic partner and telling her domestic partner, urging her domestic partner to file a domestic violence complaint against the plaintiff, was an act of retaliation. Those are all the kinds of things we argued were acts of retaliation. Okay. Some of the first ones would clearly, I think, they would be satisfied under the other definition. The ones that maybe not, and I don't know whether your definition would have helped you, were I think you also argued in your final argument that her taking book or something like that, making book on people, that was? Protected conduct. That was protected conduct? Correct. Writing down what happened? How is that protected conduct? It's protected conduct by virtue of the fact that everyone on the team perceived her as documenting activities for purposes of filing a sexual harassment complaint or a sex discrimination complaint. We introduced evidence into the record that the team admitted that that's what they thought she was doing. She testified that she was documenting for purposes of making a complaint. That's how it's protected. And then the sergeant went to Officer Brown and told her to file an IA complaint on domestic violence? It was a SIRT team member. Okay. The SIRT team member went to Officer Brown, urged her to file a domestic violence complaint, and said something's going to happen, something bad is going to happen to Liani. Did she file one? She did not file one. She went to Officer Reyna and told her what the SIRT team member had done, and that's what triggered the forced resignation. Well, obviously the facts in this situation, I mean, are as about appalling as they get in terms of, and, you know, admittedly it's a little bit shocking that it was a complete defense verdict, but that how, you know, just in general, because obviously there are a lot more aggravated things than any of those things that you're talking about. Tell me how the verdict would have been any different if you had had that instruction. Well, I think that the verdict was... Because I think that what they were arguing is that your client was just part of this whole horrible situation. I think that one of the things that the Burlington Northern type instruction does is it says that it's not simply employment-related actions. For example, in the context of this situation, some of the strongest evidence we had of retaliatory intent was of the individual who called Officer Brown. We had some admissions from him that we focused on at trial that we felt showed an intent to retaliate. And the failure to instruct gave the jury the impression that, you know, perhaps something outside the regular employment-related formal employment decisions aren't an adverse employment action. Okay. Now, you have to get over the hurdle that, you know, obviously part of the reason that objections are made are also to give a trial court an opportunity to understand what your argument is. And here, by virtue of when the court was saying everything that it was going to say on adverse employment, and I think this is what appellant's lawyer argues is, that's fine, that's fine, that's fine, and you don't at any point in time say, but, Your Honor, you know, we have this whole separate area of retaliation and where there's a different definition of adverse employment act. This is why this is crucial for us to have it, because these acts don't fall under the adverse employment definition that you're giving for hostile work environment and the other causes of action. Why are you required to at least give the court some notice of what the problem is and how it's important to your particular case? Because when you're the trial judge, it's not your job to know what a person's theory of the case is or why. It's their job to tell you that. Well, I guess there's two responses. One, my understanding of the Ninth Circuit decisional law is that if the judge tells you, you know, your objections as to any instruction you've requested is preserved, my understanding is that counsel's entitled to rely on that. And I believe I cited the Ninth Circuit case to that effect. If the judge is going to say that, I think the judge has to be held to his word, because literally I think that the judge was probably correct that if we did go through every requested instruction, there were a pile of them, that we'd have been there all night. Of course, it's arguable that Rule 51b-2 requires the trial judge to give counsel more of an opportunity than this judge gave. That was my second point, and that is this was an instruction conference. It may be different if, in fact, there was set aside a separate time to say, record your objections. Well, you could record them in writing, though, too. I mean, it's not, you know, I've been there. I know, like, some judges don't, they want to shut you up and they want to keep moving on because you've got the jury coming in at a certain time and you want to keep going. But by the same token, that doesn't alleviate all your responsibilities as a lawyer. And I've seen lawyers, and I've done it myself in terms of saying, Your Honor, I know you don't want to hear from me, but this is why I'm objecting, and this is why it's important. This is my offer of proof, and this is why, if you don't give me this, my case is fatally damaged. Well, understand that I suppose the litany of the series of events that lead it up to the pretrial conference are not unimportant in that regard. We had already faced the judge making a series of decisions that took out major portions of our case and arguing vociferously about that and the judge not being interested in hearing it. I mean, I think that that's part of the context for why not argue vociferously about this particular case. And he's one of the authors of that book on evidence, and you figured it wasn't going to work too well, right? I don't know that that was in my thinking at the time, but I'm certainly aware of that. And the second point I would raise is, just very simply, if that's going to be the Ninth Circuit rule, then attorneys, I mean, the court needs to say that, and to say that you can no longer rely upon a judge saying specifically. Okay, so what's our standard of review here in terms of he didn't give the wrong law as he gave it. He just didn't give it completely is your point, right? He didn't instruct on our theory of the case. Okay. And my understanding of, I actually have not seen a standard of review case specifically on a failure to instruct. The Ninth Circuit decisions that I have seen simply say, plaintiff is entitled to instructions on her theory of the case. Entitlement to me means it's a question of law. If the court hasn't given instructions on your theory of the case, it's reversible error. My understanding then is that it's up to the defense to prove that that error is harmless. Well, reversible error sort of means that it's not subject to the harmless error, but you're saying it would still be subject to a harmless error. It would be error, but it would be subject to a harmless error analysis. I believe that that is true. Counsel, let me shift the analysis a little bit to the implication at least that after this extended trial, the jury found that she actually participated in all of this, or at least went along with it sufficiently that she couldn't sustain a claim of sexual harassment. Was there any evidence excluded which would have indicated that she protested along the line or that she filed complaints or that she did anything to object to this hazing activity? The judge did exclude evidence from friends that Reina complained to them of the sexual hazing activities on hearsay grounds. Have you preserved that objection? We have not raised those issues on appeal. Okay. Well, then just what's your general response to at least the impression that one would get in reviewing both briefs or all three briefs that the jury probably felt that this person went along with it, perhaps just to make the point that she could be a good member of this team and therefore, in effect, gave up her legal claim? I think that the point of that is twofold. Number one, in my view, by excluding all of the evidence, almost all of the evidence and the most serious evidence that plaintiff had, that CERT team members and middle managers were acting with bad intentions. Effectively, the district court focused the whole trial on whether plaintiff was negligent in handling the sexual hazing conditions, and that is error. I mean, the whole impression that, you know, the jury rejected that her, concluded that her participation was voluntary and all that kind of thing just overlooks the whole concept that what was going on on the CERT team was these people were resisting having a woman on the team. That's what really was going on. And that's what the evidence of the 1998 selection process proves. The judge excluded it all. He did not allow us to try our case. I believe that... We review that under an abuse of discretion standard, though, don't we? I don't think that you do. These are... Exclusion of evidence? These are, well, no, let me change that. You do review it under abuse of discretion. However, these are pretrial blanket exclusionary rulings of broad categories of evidence without defense showing what the evidence is. If you look at the motions in limine, they're like four sentences, don't specify what the evidence is, without a 104 hearing on what the evidence is. It's not 403 balancing. It's 401 and 402 relevance. So to sustain those exclusions, the defense has to show that there is no possible way that category of evidence can be relevant. I would suggest to you that it is implausible, implausible to argue persuasively that resistance shown by the CERT team to point to the first woman appointed to that team is irrelevant. I would suggest to you that it is implausible to argue persuasively that resistance shown by the CERT team to point to the first woman appointed to that team is irrelevant. I would suggest to you that it is implausible to argue persuasively that resistance shown by the CERT team to point to sexual hazing practices that occur thereafter and a claim that she was forced off the team. Counsel, you're down to about a minute. You may want to reserve or not, as you choose. I will preserve my minute.  Great. We'll hear from the city. May it please the court, my name is Harry Allerback. I represent the city of Portland. Can you go right to my retaliation issue, since that's a focus of concern for me from the standpoint that obviously this was a jury, and looking at it, we see a lot of sexual harassment cases and hostile work environment, and the facts are pretty bad. But on the other hand, they're uncertain. You could argue that they're free to believe. If they believe she didn't object and she participated, then all of that. But as to the retaliation, I guess his best argument is he submitted an instruction that gave a different definition of retaliation. The judge does make the comment, if I don't give one of your instructions, you're presumed to have objected. And he does seem to be arguing in his closing argument that some of the acts of retaliation wouldn't neatly fit into the definition of adverse employment on the other causes of action, that the retaliation adverse employment definition is a little bit different. Is it error? Is it preserved error? And if it's error, I want you to tell me why it would be harmless error. Let me start. I think there are a number of questions that are embedded in that, and if you'll allow me to sort of parse them out. The first is that it's got to be preserved in two ways. I mean, he's got to make it known to the trial court in the first instance, and then he's got to make it known to this court in the brief where it is he did that. And our argument for all of the jury instructions is that the appellant's brief wholly fails to identify where in the record the claims of error are preserved in the first instance. And the court ought simply not to address them at all. As far as this particular instruction is concerned, the plaintiff's argument is based on a misreading of the Glover case. And what the court said in Glover is Rule 51 requires that a party make a specific objection to an instruction, given or not given, and that this court is not going to do that. And the court's argument is that the plaintiff's ruling applies that rule very strictly, and then goes on to say there is a limited circumstance in which we will deviate from that rule. In fact, the court cited with approval a Fourth Circuit case that said precisely that relying on a blanket exception granted by the trial judge is not contemplated by this rule. Now, what if it's not an exception, but what if it's a prohibition? I mean, here's the trial judge who says, first of all, any time I do not give your instruction, I'm paraphrasing, I'm going to assume that you have taken an exception, that you have preserved your record for your requested instruction. But he goes a little bit beyond that. He says, we could be here all evening. I mean, he's basically telling the lawyers to leave him alone. Why isn't that in and of itself, regardless of the standard of review on the instructions themselves, why isn't that inappropriate under Rule 51? Why isn't that itself an abuse of discretion to cut the lawyers off? I mean, they talk for a number of pages about stuff, and he basically says, listen, I'm getting tired of hearing about all this. Well, it is clear that the judge was trying to get the case wrapped up as quickly as possible. It is not true that the court did not entertain objections or comments or discussion about the proposed jury instructions. And that gets to my point, which is that there was a specific conversation about this very jury instruction, the retaliation jury instruction, and at no point during that conversation did the plaintiff say, you need to give an instruction about adverse employment action as it relates to the retaliation claim. Let me take it from a different angle. Suppose in light of the passage that Judge Graber read, which troubles me as well, we just simply say, well, we'll assume literally from the offer that Judge Jones made that all objections have been preserved. Suppose we just wipe out the argument, at least the threshold argument that you make about failure to preserve, and we go right to the question, does that affect your case or not? Well, if I may just backtrack a half a step, and I understand I'm going to answer your question, but what I wanted to say, just to finish the conversation about preservation, is that the exception presumes that a further exception would be futile, and you can't and that the judge is fully aware of your position. And I think it's inappropriate to find that here because of the specific conversation, because the judge did work with the definition in the other context on the other claim. It's an indication that he would in fact have considered a proper raising of the adverse employment instruction in this context, and so that the plaintiff is not entitled to the trap door in Glover because an exception would not have been futile. To get to the answer to your question, Judge O'Scanlan, the error, if there was any, is harmless, and it's harmless for a number of reasons. First of all, I don't think anybody said that if these things happened, they were not adverse employment actions. I mean, I don't think that was the argument anybody made. The issue in the case was, if there was an adverse employment action, on the discrimination side, was there a hostile work environment? Was she harassed? And the evidence, I mean, there was a nine-day jury trial. Okay, but on the hostile work environment and the discrimination, I'm with you. I'm tracking you on that. Because if they believed that she was part of it, she didn't complain and all of that, that's one thing. But if the complained acts of retaliation are that someone from the team went to someone I'd had a relationship with, told them to file an IA against me on domestic violence and this, that, and the other, if they put me on a desk, they did this, that, those aren't really exactly related to that, you know, how does that, if she participated and she went well along with that, how do those defeat those acts of retaliation? Well, that's a, you're right, that's a separate inquiry. The inquiry was whether she engaged in some protected activity that caused the city, and remember, the defendant here is the city of Portland, not Officer Stradley or anybody. The defendant here is the city of Portland. So the question is, was there something that she did that qualified as protected activity that caused the city to take some action against her in retaliation? And the, the argument, the arguments in front of the jury were not focused on whether these were qualified as, as protected activities or whether it was... There was no retaliation, though, about the keeping book. He talks about going to Officer Brown and reporting her. I saw, I read his argument. Correct. And so, there isn't, there isn't any question that she was writing things down in the notebook. That wasn't a disputed... But he's saying that, that she was retaliated, that it was a retaliatory action by going to Officer Brown. That's right. And he argued to the jury that they retaliated against her for doing that. And we argued to the jury that they didn't retaliate against her for doing that. We didn't say that, well, if she did it and we retaliated against her, it doesn't matter because it's not a, it's not a protected activity or it's not an adverse employment action. We're saying we didn't do it. We didn't do it because whatever... Yes, but the fact that you argued it that way doesn't mean that's what the jury was thinking about. They may very well have believed that it happened and that it was on account of what she had done and then read their instructions and said, well, she still loses. That's the problem. It's not just a matter of that the jury had to agree with either your argument or their argument. That's their only option. And when we're looking at it, we have to look at the possibility that they believed the plaintiff's facts and his interpretation of the events, but nevertheless felt constrained by the instructions. Well, all I can do then is suggest that you read the transcript carefully. The evidence, I think, was fairly overwhelming that there was not retaliation against her, that there were legitimate reasons for everything that happened. And... Was it disputed in the facts that this member went to Officer Brown and told her to file that? Was that disputed? What Officer Stradley testified to, Officer Stradley was the officer who was the plaintiff's first training officer her first year on the CERT team. The following year, what he testified to was he had received a report of some disturbing activity that Officer Reyna had been involved in regarding her former lover and that woman's new partner. And so he was concerned about what was going to happen to Officer Reyna. There was reference made to prior instances where Portland police officers had, a Portland police officer had killed himself, and they were very concerned. They didn't want Officer Reyna to, that to happen to her. So he testified that he called the former partner and said, you need to do something to take care of yourself. He said he did it out of concern for Officer Reyna's well-being and not to retaliate against her. That was his testimony. All right, but he admits making the call. Yes, he admits having a conversation with Officer Brown. Could I, with permission of my colleagues, move to another issue, and that is the exclusion of the selection materials. As I understand the court's ruling, it was, as opposing counsel stated it, that it was a relevance ruling. It was not a 403 ruling. And that, if that is true, it is of concern to me because it's a very low-level ruling. It's a very low-level ruling. It's a very low threshold, and the possibility that resistance to the inclusion of women on the CERT team motivated not only the selection process, but continued to permeate the environment, makes it seem potentially relevant. A 403 ruling later on could be on another basis, but, and, you know, maybe it was, there are many things that could be on a different basis for a 403 ruling that might say, well, it's relevant, but, and I think the extent of our difference is greater when it's relevant, but too much of a distraction or whatever. But I took the court to be saying it's not relevant at all, and I have some difficulty with that. Well, I agree with that it was not relevant at all. But is that the court's ruling? That's what I want to get. I was looking particularly at ER 311, I believe it is, and it matters to me. Maybe not to my colleagues on the panel, but I have kind of a different way of analyzing it in my own mind if he's saying it is not relevant versus it is relevant, but there are these other factors that I'm weighing. I believe that he did, I have to go back and look, but I believe he did sustain the motion on relevance ground. This court, of course, can affirm on any grounds that's apparent from the record, even if. So we're supposed to re-weigh 403 issues? You are free to weigh them. I would submit that it is not relevant, and it is not relevant, again, because what we're talking about is the conduct of the City of Portland. The City of Portland placed Officer Reyna on the CERT team, and that, and so the, certainly in the context of the evidence that was admitted, not only was this not relevant, these materials were not relevant, but admitting these, whatever this evidence was, was not going to change the outcome, because ultimately- How is that necessarily the case? If a person is hired with delight, and someone else is hired grudgingly because we feel like we have to under the law, and it really irks us, and each of them suffers something adverse later, isn't that potentially a violation of the law? It's not necessarily pertinent to the motivation and the context in which those adverse things might occur. Well, it might be, but not in this case. And the reason it doesn't in this case is because the plaintiff got to ask all these people about whether they wanted her on the team or not. And there was evidence that some of them didn't think that it was her time to be on the team, because they believed that she had been placed above people who had scored a higher than she had on the selection test. But they all testified that once she got there, they wanted her to succeed because their lives depended on it. And so the evidence was there. There was evidence about whether some people wanted her on the team or didn't want her on the team. But she's entitled to try her case as she wishes, so long as the evidence is relevant, and it is not subject to 403. So if there are five relevant pieces of evidence, and the district court excludes one or two or three of them as being not relevant, I have some problem with that, I guess. Well, I understand that. All I can say is that the, without very much specificity about what the excluded evidence was, it's hard to put it in its context. But basically, you're talking about, because there's so many different actors in what happened, you're trying to figure out how we're going to attribute what happened to the plaintiff to the City of Portland, the only named defendant in this case. You keep saying only named defendant. Is Chief Croker, or at least the police chief, out of the case? He was dismissed on summary judgment, and there have been no claims raised on appeal as to him as far as I can tell. So we're trying to attribute conduct of some people in some other context to the city in a different context, and it's sort of a moving target. And I don't think that the fact that some people in the cert team might not have wanted the plaintiff on the team is relevant to whether the city is chargeable with sex discrimination, certainly with sex discrimination that happens later, because again, the evidence wasn't that anybody harassed Officer Reyna because of her sex. They didn't direct this inappropriate conduct at her specifically. They all sort of engaged in this junior high stuff. But that was the question for the jury. I mean, what you just described is the question for the jury. And if there are other pieces of relevant evidence that bear on how she was viewed. But they didn't, they weren't relevant to, I mean, whatever might have been going on in the back of somebody's mind who may or may not have wanted her on the cert team doesn't have anything to do with why these officers, even before she was there or after she was there, dressed up in stupid costumes and engaged in funny skits. She never said, they made me go to strip clubs. She went there because she wanted to. She didn't ever say, they made me sit at the front row and put money on the table. She did it because she wanted to and she admitted it. So it isn't, you know, the evidence of what might have been in somebody's mind about whether they wanted her on her team just is far afield of anything that really ever happened once she got appointed to the team. And I don't think the judge made a mistake when he said it wasn't relevant in these circumstances. When the officer went to, the officer from the team went to Officer Brown, was that after she had reported it to the chief? No. That was, I'm trying to, I believe that was in November of 2000. And sort of the timeline of what happened was that Officer Moreno was appointed to the CERT team in the beginning of 1999. She went to the Camp Rylea training in the summer of 1999 and again in 2000. And there was the meeting in May of 2000 where they criticized some of her performance issues and that's when she said she started to feel bad about them. But she went back to Camp Rylea that following summer and resigned from the CERT team at the beginning of November. Just prior to that, I believe, is when she had the episode at work that wound up having her transferred to the telephone reporting unit while they could verify her medical fitness for duty. And it was in that time period in November when Officer Stradley made the phone call to her. She did not come to the chief of police with any kind of, you know, comments about the CERT team until, I believe, the beginning of 2001. So it was after that. All right. They already knew she was making, writing her book, I guess, though, when they contacted Officer Brown. That was six months later. I mean, she was... Well, she was writing her book when she was on the, she was documenting things when she was on the team, right? She started doing her, writing things down in her notebook after the inter-perimeter team meeting in May of 2000. And Officer Stradley's testimony, at least, was that that seemed to abate some after a while and it wasn't until they were no longer, I mean, they weren't at Camp Brialeo when he made the phone call. It was six months later. They were back in Portland. Thank you, Counselor. Your time has expired. Mr. Brachetto, you have a little bit of time left. I'll try to keep it to one minute. Number one, I do want to point out that the verdict form did not have special interrogatories focusing on whether Plaintiff voluntarily participated in the harassment. And whose fault is that? Whose fault is that? I'm not alleging fault. What I'm saying is, it is evidence as to how the jury decided the case. A harmless error issue might be different if there were a special... Okay, I get it then. Okay. Number two, we did have admissions from Stradley that we offered into the record that one of the new plaintiffs was keeping book. Number three, the 1998 selection process information, it is important on virtually every claim in the case. For example, mid-level management knew about the allegations that the CERT team was manipulating the process to keep Rayna out. They lie about it in the city's investigation. It goes to the issue of whether they had been involved in the process and whether they took reasonable care to prevent harassment. How on earth could managers, knowing that there was a concern about CERT team members keeping her off the team, permit the kinds of conduct that went on? Was there any indication, though, that the conduct was any different when she was there than it was before? Yes. There actually was evidence contained in one of the exhibits that the sexual hazing increased and was the worse at the time Rayna was on the team. You know, I mean, it's pretty damning in our view, but we weren't allowed to try that case. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision and the court will take its recess. For how long? It will be a five-minute recess. Thank you.
judges: O'scannlain, Graber, Callahan